Herbert RUBIN, as Trustee of U.S.N. Co., Inc., Bankrupt, and Eliot H. Lumbard, as Trustee of Universal Money Order Co., Bankrupt, Plaintiffs,

v.

MANUFACTURERS HANOVER TRUST COMPANY, John M. Trent and Eugene Skowron, Defendants.

Bankruptcy No. 79 Civ. 189 (MP).

United States District Court, S. D. New York.

May 5, 1980.

Herzfeld & Rubin, New York City, for plaintiffs; Terry Myers and Morrell I. Berkowitz, New York City, of counsel.

Simpson, Thacher & Bartlett, New York City, for defendant; Rolon W. Reed, John F. Cambria, New York City, of counsel.

## OPINION AND DECISION

MILTON POLLACK, District Judge.

The issues herein were tried to the Court at a Bench trial. Jurisdiction is posited on federal questions asserted under the Bankruptcy Act of July 1, 1898, former Title 11 U.S.C. section 1 et seq. The gist of the claims is that the defendant bank misapplied the monies and securities of the bankrupts in violation of bankruptcy law. For the reasons shown hereafter, plaintiffs are not entitled to recover on any of their claims.

Universal Money Order Co. ("UMO") and U.S.N. Co., Inc. ("USN") are affiliated corporations, both of which, up until 1977, were engaged in the business of selling money orders. Both UMO and USN are 100% owned by International Express Co. ("International"), which is in turn 89% owned by John M. Trent and Eugene Skowron.[1] On January 12, 1977 UMO filed a petition for an arrangement under Chapter XI of the Bankruptcy Act. USN filed a petition in bankruptcy on January 21, 1977. Administration of both estates was assigned to the Honorable John J. Galgay, Bankruptcy Judge, who appointed plaintiffs, Herbert Rubin, Esq., as trustee of USN, and Eliot H. Lumbard, Esq., as trustee of UMO.

This suit was filed by both trustees about two years later, on January 12, 1979, seeking recoveries of assets or damages from the bankrupts' bankers, Manufacturers Hanover Trust Company ("MHT"), and from Messrs. Trent and Skowron, the principal owners of the bankrupts. The amended complaint asserted ten separate claims. Prior to trial, the plaintiffs' claims and the cross claim of defendant MHT against Trent and Skowron were severed from this action by consent of all parties; and the claims asserted against MHT by plaintiffs in Counts 3, 5, 7 and 9 were discontinued with prejudice by stipulation of said parties.

The remaining claims, Counts 2, 4 and 10 of the amended complaint, were those tried against MHT.

In Counts 2 and 10, plaintiffs seek to recover money and securities of the bankrupts deposited with MHT which MHT applied in 1977 and thereafter to debts arising from defaulted loans made to sales agents of the bankrupts. MHT applied those assets pursuant to guarantees and cross-guarantees by the bankrupts of the debts involved, which guarantees were part of an interlocking series executed by Messrs. Trent and Skowron in their personal and in their corporate capacities on behalf of UMO, USN and International.

Under this series of guarantees and cross-guarantees each element of the Trent/Skowron pyramid guaranteed loans extended by MHT to certain check cashers who acted as money order sales agents for the Trent/Skowron enterprises.

The trustees contend, however, that the bankrupts did not authorize and were not bound as guarantors of the loans extended by MHT to those check cashers referred to hereafter as "National" and "TWO"[2] to which MHT allegedly applied the monies and securities of the bankrupts; that there was no fair consideration given to the bankrupts for the guarantees of the questioned loans; and, because the bankrupts were at all times allegedly insolvent, that MHT's application of the assets of the bankrupts towards satisfaction of said check cashers'

1. The other 11% of International is owned by Eugene Johnson, the sales manager of the enterprises; he is not involved in this case or in any of the transactions relevant herein.

2. National Payroll Services Ltd. ("National") was a holding company for eleven check cashing stores; TWO Check Cashing Stores ("TWO") was a holding company for four check cashing stores.

debts to the bank resulted in a fraudulent conveyance under bankruptcy law.

In particular, in Count 2 plaintiffs assert that in December 1976 MHT impermissibly placed obligations of said New York City cashers (National and TWO) on UMO which were neither approved by UMO nor accepted with "fair consideration" to UMO. In Count 10, plaintiffs assert that in September 1976 MHT impermissibly imposed on USN and UMO certain food stamp obligations which National and TWO owed to the New York City Department of Social Services. The alleged financing by MHT of these food stamp obligations was neither authorized by USN or UMO nor accepted with "fair consideration" to the bankrupts, according to the trustees.

In Count 4, plaintiffs sue to recover 5,000 shares of Gulf Oil Common Stock which Trent had pledged with MHT many years ago as collateral security for his guarantees. The trustees contend that the stock in reality had been registered in the name of USN and was wrongfully transferred by Trent into his own name and wrongfully pledged by him. The stock was ultimately sold by MHT and the proceeds were applied toward satisfaction of Trent's obligations to MHT on loans furnished to money order sales agents.

*History of the Business*

Trent and Skowron started USN in 1962, incorporating it under the laws of the State of New York. Trent had previously been in charge of the money order operations of American Express in Los Angeles. The business of USN was to sell money orders through agents. Trent and Skowron found that licensed check cashers in New York were very desirable agencies through which to sell money orders; they were equipped with bullet-proof glass teller cages, and their check cashing service enabled purchasers of money orders to obtain, then and there, cash needed to buy the money orders.

USN opened a bank account with MHT in 1964 and thereafter arranged for its sales agents to become borrowers from the bank. The purpose of this arrangement was to enable USN's sales agents to repay USN once a week for money orders which they had sold instead of holding back on settlements and using the money in the agents' general business.[3]

The extent to which the interests of Trent and Skowron were wrapped up in and aligned with the interests of the check cashers is demonstrated by the testimony of Robert Sparago, an officer and general counsel of USN (and later also of UMO), that "the check cashers comprised the major part of the money order business of USN" and "[w]ithout the check cashers there was no USN".

The business of the Trent/Skowron enterprise grew, and in 1970 they incorporated UMO in the State of New Jersey for the purpose of acquiring and assuming the money order business of a California corporation of the same name. According to Mr. Sparago, in order to be licensed for the sale of money orders in California, it was necessary to do business in more than one state. Consequently, Trent and Skowron allocated to UMO the business operations previously conducted by USN in New Jersey, Pennsylvania, Ohio, West Virginia, and later Colorado and Massachusetts. Thereafter, USN was utilized by Trent and Skowron in the sale of money orders primarily within the state of New York. The principal officers and directors of both UMO and USN were: Trent, president; Skowron, secretary-treasurer; Sparago, assistant secretary, director and general counsel.

Although there was this geographical division in the operations of USN and UMO, in the minds of their principals and in fact they were conducted as and existed as a combined single enterprise. Mr. Trent testified that "it was all one ball of wax" and

---

**3.** Money order businesses operate primarily on "float"—that is, on the use of the money received on the sale of money orders between the time of purchase and the time that payment is demanded on the money order. Consequently, prompt settlement of the agents' accounts was crucial to the viability of the business. This is demonstrated by the precipitous collapse that ensued upon the loss of one or two days' float from the business. *See, infra.*

that the funds of USN and UMO were pooled into a single bank account at the Colonial Bank and Trust Company in Waterbury, Connecticut, and were used interchangeably to meet the money order pay-outs of the two companies as they became due. Similarly, the companies obtained and had a single "transit number" from the Federal Reserve Bank.[4] The number of money orders sold by each company in an average month could not even be stated separately because the accounts were "jumbled together", and because, as Mr. Sparago testified, "we dealt with them as one entity for an analysis point of view"; it was only possible to tell how many orders were sold by the two combined. (The business of the companies together reached a sales volume of 900,000 money orders a month, representing a daily average of $1,850,000. face amount of money orders.)

*The Banking Arrangements*

The check cashers through whom the Trent/Skowron enterprises sold their money orders required a steady supply of cash on hand for the cashing or purchase of checks. As already indicated, Trent and Skowron had a vital business interest in keeping them supplied with bank credit to obtain this ready supply of cash and, as far back as 1966, had agreed to personally guarantee and posted collateral for bank loans from MHT to their various money order outlets. Under the arrangement that evolved, MHT opened a loan line against which Messrs. Trent and Skowron would submit monthly schedules of requested loans to their check cashers. The amount of credit so made available by the bank was a variable multiple of the pledged collateral.

On November 13, 1970, these arrangements were formalized and expanded when Trent and Skowron executed a guarantee of "all obligations" owed the bank, "whether now existing or hereafter incurred" by "certain licensed check cashers as shall be listed and described in schedules sent from time to time to Bank by" Trent and Skowron. Under this agreement, as before, Trent and Skowron would submit monthly lists requesting MHT to make loans to check cashers who were acting as sales agents for the Trent/Skowron enterprises. To the extent that the loans were approved and made by MHT, they would be covered by the guarantee.[5]

After the 1970 guarantee was signed, check cashers selling UMO money orders outside New York obtained benefits directly under the loan line. To implement the overall arrangements, and to reflect the fact that the interests, benefits and burdens of the arrangements were shared by one and all of the incorporated pocketbooks comprising the Trent/Skowron enterprises, Trent and Skowron from time to time executed in their own names and on behalf of USN, UMO, and International Express, a series of guarantees and cross-guarantees covering the obligations to MHT. Among the obligations guaranteed were those of, (i) *USN* by Trent, Skowron and UMO; (ii) *Trent and Skowron* by UMO (dated November 28, 1972, July 30, 1975 and September 21, 1976); (iii) *Trent, Skowron and UMO* by USN (on November 28, 1972). Twenty-nine guarantees or cross-guarantees were executed over the years 1970–76 in favor of MHT all pertaining to the Trent/Skowron, International Express, USN and UMO relationships, directly or indirectly, with the sales agents and the intercorporate vehicles of the overall enterprise.

The bank's evident purpose in obtaining these guarantees was to make sure that no corporate barriers stood between it and the assets of Messrs. Trent and Skowron. Mr. Trent testified that he well understood that the bank's purpose was "to be sure that there were no loopholes anywhere," and

---

4. By having a transit number with the Federal Reserve USN and UMO were able to have their money orders delivered by the Reserve directly to the companies' offices instead of being handled through their bank in Waterbury at greater expense.

5. Loans made under the loan line were nominally due three days from the date on which the loan was made. However, at least during the period 1975–1976, the loans would not actually be paid off, but were simply renewed or "rolled over".

that he had no quarrels with that purpose, given the importance of the open credit line to the well-being of the Trent/Skowron enterprises.

Each of the guarantees is entitled "Guarantee of All Liability with Collateral and Security Agreement",[6] and states that the guarantor "hereby absolutely and unconditionally guarantees to Bank the prompt payment of claims of every nature and description of Bank against Borrower" and that "this guarantee shall be a continuing, absolute and unconditional guarantee of payment."

Under the November 13, 1970 Trent/Skowron guarantee and these various later guarantees, MHT loaned up to $12 million, against $3 million in pledged collateral, to the check cashers listed on the monthly schedules sent to MHT by Trent and Skowron. As noted above, among the check cashers listed in these schedules were UMO sales agents located in New Jersey, Massachusetts and Ohio. Moreover, in 1972, MHT also agreed to loan money directly to UMO to enable it to furnish cash to California check cashing stores that sold UMO money orders. In fact, at the time the second UMO guarantee was executed on July 30, 1975, MHT loaned $500,000 directly to UMO.

*Food Stamp Activities of Check Cashers and MHT*

Food stamps were introduced into the New York area in or about 1970, having previously been used experimentally in other parts of the country. On July 1, 1972, MHT entered into a contract with New York City's Department of Social Services, the agency responsible for food stamp operations in the City, under which MHT became authorized to act as a vendor of food stamps. MHT's role in the distribution of food stamps was essentially that of a wholesaler who distributed the stamps to various sub-vendors, who acted as retailers. Many of the New York check cashers who sold USN money orders acted as MHT's sub-vendors in this regard.

Under the pertinent United States Department of Agriculture ("USDA") regulations, food stamp sub-vendors were required to deposit with the bank for the account of the New York City Department of Social Services the cash received from the sale of food stamps within 24 hours of receipt, if their sales totalled more than $1,000. Where sales totalled less than $1,000, deposits were to be made at least on a weekly basis.

The evidence showed that this regulation was not observed by a number of check cashers, who, rather than remit the funds as required, held on to them for varying periods of time for use in their businesses. In this manner, it appears, several check cashers built up substantial arrearages in food stamp remittances (or, in the parlance adopted by the parties, developed substantial "food stamp floats"). Among the check cashers involved in such activity were some of those owned by National and TWO. All National and TWO stores acted as USN's sales agents in the sale of money orders.[7]

Early in 1976, the USDA became concerned about the problem of late remittances of food stamp funds on a nationwide basis. As part of its effort to deal with the problem, the USDA conducted a review of issuing agents in New York City. The USDA audit of National revealed that all of the National stores combined had developed a food stamp "float" of some $300,000.

---

6. Under these guarantees, UMO pledged various securities as collateral. The third UMO guarantee of September 21, 1976, in fact, was apparently executed only in order to reflect the instructions for exchange of collateral given by UMO to MHT in 1975 and 1976, and to add a $187,000 certificate of deposit to the listed collateral. USN, on the other hand, did not pledge any collateral under its guarantees, but rather gave MHT a continuing lien on USN's accounts at MHT.

7. The ties of National and TWO to Trent/Skowron enterprises in fact went beyond those of mere sales agents. Trent and Skowron had a collective 50% common stock interest in National and a 33⅓% interest in TWO. The National and TWO stock was nominally held by Empire Small Business Investment Corp., which was 100% owned by Trent and Skowron.

In September 1976, as one possible solution to this problem, Mr. Sparago, on behalf of Messrs. Trent and Skowron, suggested to the relevant government and bank officials that the check cashers could make daily food stamp remittances by depositing a money order at the end of each day equalling the amount of food stamp sales for the day. This was not satisfactory to the bank, which proposed instead that the Trent/Skowron loan lines be temporarily increased to allow the check cashers to settle their food stamp accounts with the City. According to Mr. Sparago, the bank suggested that it might be unwilling to continue making loans to the Trent/Skowron sales agents involved unless their food stamp accounts were promptly cleared up.

To avoid such a suspension of credit to the check cashers, which would, in Sparago's words, have put Trent/Skowron enterprises out of business, or at least put a crimp in an important segment of it, Mr. Skowron expressly requested in a letter dated September 15, 1976 that the maximum amount available to National under the loan line be increased from $1,250,000 to $1,550,000. In the same letter, Mr. Skowron requested that the maximum amount available to the TWO stores be increased a total of $200,000, from $290,000 to $490,000. Mr. Trent and Mr. Sparago both testified that Mr. Skowron made and was unquestionably authorized to make this request on behalf of the whole Trent/Skowron group, i. e., International, USN and UMO, to help their check cashers remain in operation. The overall viability of the check cashers was what was important to Trent and Skowron.

As a result of the increase in the loan lines, National and TWO were able to place their food stamp accounts on a current basis.[8]

*The Claim Based on the Solution of the Food Stamp Problem*

Count 10 alleges that MHT made loans to the National and the TWO check cashers in September 1976 knowing that such loans would be used by those check cashers to bring their food stamp accounts with the City into a current status. It is claimed that the Trent/Skowron guarantees did not cover the food stamp business of the check cashers, and that MHT knew this, but that MHT nonetheless compelled the Trent/Skowron enterprises to expand the guaranteed loan lines to allow the check cashers to clear up their debts on food stamps. Plaintiffs say that the check cashers involved did not repay the extra loans they thereby received, that these were rolled over when due, and ultimately resulted in the application of the assets of USN and UMO toward satisfaction of the indebtedness when the check cashers failed to repay the "food stamp loans". The use of the USN and UMO guarantees to assist the check cashers to cover their indebtedness to the government on food stamp obligations is said to have been an unconsented-to modification of the underlying agreement that resulted in the discharge of USN and UMO as guarantors. Alternatively, if the "modification" was consented to, it is claimed that no fair consideration was given for it, and it thus resulted in a fraudulent conveyance.

*The Collapse*

Nothing remarkable seems to have occurred in September, October and November following the September 16, 1976 expansion of the loan lines. On or about December 6, 1976, according to Messrs. Sparago and Skowron, MHT informed Trent and Skowron that it no longer desired to extend credit to out-of-state check casher sales agents, with the exception of those owned by Propper Demonstrations Sales Corp. ("Propper"). Propper owned check cashing stores in New Jersey, Boston and Cleveland, all of which sold UMO money orders. The precise reason for MHT's action was not specified at trial.

On or about December 27, the loan obligations of National and TWO under the

---

8. There was no direct testimony that National and TWO in fact used the money from the increased loan line to pay off their food stamp obligations, but when National went out of business early in 1977, it had no outstanding food stamp "float".

loan line were due and unpaid; these amounted to $1,550,000 and $390,000, respectively.[9]

However, on December 31, 1976, a loan was made of $1,000,000 to the individual check cashing concerns owned by National and TWO. In conjunction with this loan a further guarantee of the obligations of National and TWO to MHT was executed by USN.

Shortly after these events, a number of banks with whom Trent/Skowron enterprises did business got wind of the fact that the group was facing some sort of financial stringency. As a result, the banks took away what Mr. Trent termed the "next day availability" of the money order businesses—that is, the banks would no longer permit USN and UMO to draw against check deposits on the second day after the deposits were made, but rather withheld the right to draw thereon until day three or four. As described by Mr. Trent, "this took a whole day's worth of float out of the operation, which is about $2,000,000 and it could ill afford to have that."

Apparently, these events sent Trent/Skowron enterprises spinning rapidly downward in spiral fashion: with the loss of the $2,000,000 float, the money order obligations sold in the names of USN and UMO could not be met early in 1977 as they became due, which caused the banks to tighten up even more (Mr. Trent mentioned one California bank that demanded 10 working days before it would allow Trent and Skowron to draw on deposited checks), which increased their inability to meet their obligations, etc.

As mentioned above, UMO filed a petition for an arrangement on January 12, 1977, and USN filed a petition in bankruptcy on January 20, 1977.

*MHT's Application of the Assets of UMO and USN* [10]

On January 11, 1977, MHT applied $79,695.34 from UMO's checking account and $294,722.74 from USN's checking account to the loan made by MHT to National on December 24, 1976 under the guarantee arrangements of the Trent/Skowron enterprises.

Beginning on August 17, 1978 and ending on October 16, 1978, MHT liquidated securities pledged with guarantees in the name of UMO,[11] and applied $318,186.26 to overdue loans made to the various TWO check cashing stores, and applied $513,414.93 to debts of Propper, consisting of an overdraft of $172,090.89 and a $300,000 loan in default, plus interest. The remaining money realized in the liquidation, $459,277.26, was delivered to plaintiff Lumbard, the trustee of UMO, on November 27, 1978.

Plaintiffs seek herein to recover the amounts applied to the debts of National, TWO, and Propper.

9. Mr. Sparago testified that the defaults were precipitated by MHT's refusal on December 24 to send out any money to National and TWO under the loan line. While this testimony conflicts with the stipulation of the parties that the loans to which the assets of USN and UMO were ultimately applied were made on December 24, Mr. Sparago's testimony is illuminating for another reason: it suggests that at that time, National and TWO were operating almost entirely on the capital provided under the loan line.

The precarious financial condition of National was certainly recognized by Trent and Skowron, who had devised a plan for infusing new capital into National, and at the same time liquidating their interest in it, by selling each of the individual stores to the store managers. The store managers were supposed to get the funds to finance this plan through loans from the Small Business Administration, under a mi-

nority enterprise program. As the loans from the SBA were not forthcoming, the plan never materialized.

10. The figures given hereafter were stipulated by the parties—the Court has been unable to verify them and thus must rely on the stipulation.

11. MHT's liquidation of the collateral pledged in the name of UMO was carried out pursuant to a stipulation entered into by the parties before Judge Galgay. The stipulation provided that whereas the parties desired to stop the accumulation of interest on the obligations of Trent and Skowron to MHT, and whereas UMO desired to be paid the excess of the value of the collateral over the debts claimed by MHT, the collateral would be liquidated without prejudice to the trustee's claims to the full value of the collateral—i. e., the claims herein asserted.

## DISCUSSION

█ Both Counts 2 and 10 assert claims that MHT engaged in a fraudulent conveyance when, pursuant to the guarantees of USN and UMO, it applied their assets to the debts of the check cashers.

Section 67(d)(2) of the Bankruptcy Act, formerly 11 U.S.C. Section 107(d)(2), provides in pertinent part:

Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent; or (b) as to then existing creditors and as to other persons who become creditors during the continuance of a business or transaction, if made or incurred without fair consideration by a debtor who is engaged or is about to engage in such business or transaction, for which the property remaining in his hands is an unreasonably small capital, without regard to his actual intent.

Section 67(d)(5), formerly 11 U.S.C. Section 107(d)(5), provides further that:

a transfer shall be deemed to have been made at a time when it became so far perfected that no bona fide purchaser from the debtor could thereafter have acquired any rights in the property so transferred superior to the rights of the transferee therein.[12]

Thus, for plaintiffs to make out their claim of fraudulent conveyance, they must prove a lack of fair consideration for the transfer, and insolvency or insufficient capital at the time of the transfer. Plaintiffs have succeeded in proving neither.

*Fair Consideration was Furnished*

Plaintiffs assail UMO's guarantees under Count 2 of the amended complaint. However, it is clear that there was ample and fair consideration to support UMO's guarantees. For each of the guarantees executed, UMO and its alter-egos had a vital interest in inducing MHT to make—and continue making—loans to check casher sales agents. The record is replete with evidence from Messrs. Trent and Sparago of the integral role that the loan line played in the Trent/Skowron enterprises.

Under these guarantees, MHT extended loans far in excess of the value of the collateral pledged to both in-state and out-of-state check casher agents. The guarantees state that "Obligations, and each of them, shall conclusively be presumed to have been created, contracted or incurred in reliance upon this guarantee," and it is clear that MHT did in fact so rely on the guarantees. UMO's receipt of indirect benefits because of its affiliation and identity of interest with the direct recipients of the loans was receipt of fair consideration. *McNellis v. Raymond*, 287 F.Supp. 232, 238 (N.D.N.Y.1968), *aff'd in pertinent part, rev'd on other grounds*, 420 F.2d 51 (2d Cir. 1970). *See also, Williams v. Twin City Co.*, 251 F.2d 678 (9th Cir. 1958); *Mandel v. Scanlon*, 426 F.Supp. 519 (W.D.Pa.1977).

Additionally, however, between 1972 and 1976, MHT loaned money directly to UMO from time to time. These loans were in part procured and protected by the cross-guarantees of USN, International, Trent and Skowron, all of which provide another adequate source of consideration for UMO's guarantees of their obligations to MHT.[13]

12. The pertinent New York debtor/creditor laws are virtually identical to the federal provisions, except that under the New York statutes, the transfer apparently need not occur within one year of the filing in bankruptcy. *See* N.Y. Debtor and Creditor Law §§ 270–274 (McKinney 1945).

13. Plaintiffs contend that the extension of loans to UMO cannot be considered in weighing the sufficiency of consideration for the guarantees because the loans to UMO were fully collateralized, apart from the guarantees. This argument presupposes that the loans were obtainable without the supporting cross-guarantees. However, at the time of the second UMO guarantee of Trent/Skowron obligations, a $500,000 loan was made directly to UMO. This demonstrates that the loan to UMO was tied in to the skein of cross-guarantees and not, as plaintiffs

The extension by MHT of loans over a period of four years to UMO and to check cashers who played a paramount role in the business scheme of UMO in particular and Trent/Skowron enterprises in general was certainly fair consideration for UMO's guarantees.

Plaintiffs attempt to obfuscate these unremarkable propositions by drawing a series of artificial boundaries. They contend that MHT's decision on or about December 6, 1976 to discontinue loans to out-of-state check cashers (with the exception of those owned by Propper) *ipso facto* invalidated UMO's guarantees by rendering them devoid of fair consideration.

This argument fails on a number of grounds. To begin with, plaintiffs have focussed on the wrong date. With respect to the collateral pledged under the guarantees, Section 67(d)(5) deems the "transfer" to have occurred, for purposes of judging the fraudulence of the conveyance, at the moment when UMO surrendered possession of the collateral. This is the point at which MHT had a perfected security interest in the collateral. *See* N.Y.U.C.C. Section 9–305.

The last pledge of collateral in the name of UMO was apparently made on September 21, 1976, at the time the last UMO guarantee was executed. Plaintiffs, by the terms of their argument, apparently concede that there was sufficient consideration for UMO's guarantees as of that date, and, as noted above, there clearly was sufficient consideration.

Plaintiffs' argument also ignores the fact that UMO's guarantees were unconditional and continuing, and thus could only be terminated by a valid revocation on the part of UMO. *See* 10 *Williston on Contracts* Section 1253 (3d ed. 1967). The guarantees each provided for revocation by stating,

> No notice of termination shall be effective unless in writing and executed by Guarantor, provided however, that this guarantee and all of the provisions hereof shall continue and remain in full force and effect with respect to obligations theretofore created and existing as if no such notice of termination had been given.

UMO never made such a revocation, and consequently, UMO's promise of guarantee remained "in full force and effect" after December 6, 1976.

An equally fundamental flaw with plaintiffs' theory is that it rests on a factitious partitioning of UMO from the rest of Trent/Skowron enterprises that is simply untenable in light of the business realities of the situation. As previously mentioned, there was no functional reality to the corporate barriers separating Messrs. Trent and Skowron from USN and UMO, and USN and UMO from each other—they were alter-egos. Indeed, plaintiffs concede in their Post-trial Memorandum that

> It is apparent on the instant record that the Trent/Skowron enterprises disregarded corporate form. The record makes amply clear that both USN and UMO constituted corporate pocketbooks for Trent and Skowron . . . .[14]

argue, divorced from the overall arrangements. Plaintiffs' attempt to splinter off the UMO loans from the rest of the business relations and agreements between MHT and Trent and Skowron suffers from the same artificiality that infects the rest of their arguments as indicated in the text hereafter.

14. Although plaintiffs concede the unreality of the corporate barrier between USN and UMO, they argue that it would be inequitable for the Court to pierce the corporate veils in this case. This argument is based on little more than the notion that the equities in favor of a creditor bank are always less compelling than those in favor of other creditors. However, there has

been no evidence presented reflecting bad faith on the part of MHT (which perhaps accounts for plaintiffs' decision not to pursue a "fraudulent intent" theory). On the contrary, MHT, at the behest of Messrs. Trent and Skowron and in reliance upon the guarantees here in issue, extended millions of dollars in loans, far in excess of the collateral pledged. This Court is of the opinion that it would be inequitable to allow corporate barriers with no factual or functional reality to be asserted against the bank after the bank, with the acquiescence of the principals, took every precaution to prevent that possibility.

Since from the viewpoint of Messrs. Trent and Skowron there was unquestionably fair consideration for maintaining the guarantees after December 6, there was also such consideration for each of their alter-egos.

At any rate, the relationship between MHT and UMO was a very beneficial one from UMO's point of view, and this benefit endured beyond December 6, 1976. Thus it is conceded that UMO received direct loans from MHT up until December 27, 1976, and that in December 1976, MHT loaned $300,-000 to check cashers owned by Propper, which sold UMO money orders.[15] Even if other sales agents who handled UMO money orders did not receive loans under the loan line after December 6, UMO could have used the proceeds of its own direct loans to supply its agents with needed cash. Moreover, inasmuch as the loans to USN's agents allowed those agents to settle their accounts with USN on a prompt basis, the loans provided funds which both USN and UMO used to meet their money order obligations. Thus UMO received a direct benefit from loans made to USN agents.

The foregoing discussion applies equally to the contentions of the trustees under Count 10 of the amended complaint pertaining to the circumstances of the expansion of the loan line on September 16, 1976 in relation to the cure of the food stamp problems of the check cashers.

The contention that there was no fair consideration to USN and UMO for using the loan line to clear up food stamp debts of the check cashers overlooks the particular value of food stamp activity for check cashers. Mr. Santiago, an officer of National, testified that the USDA was threatening to bar the check cashers from engaging in the sale of food stamps in the future if they continued to be delinquent in remitting food stamp funds; if the USDA had found it necessary to fulfill this threat, the financial outlook of the check cashers would have been much the worse, since, as Mr. Trent noted at trial, the food stamp operations were a pure-profit, no-risk enterprise.[16]

The decision made by Messrs. Trent and Skowron was simply that it was in their best interests to attempt to assist the check cashers by providing them with fresh capital rather than risk having them go under at that time. MHT's continued extension of loans, in an authorized amount greater than had previously been available, was certainly fair consideration for the guarantee of these loans by Messrs. Trent and Skowron, USN and UMO.

---

15. Plaintiffs have tried to disparage the loans to Propper by arguing that in October of 1976, Skowron wished to terminate business relations with Propper, but that MHT opposed the move. What this fact, if true, signifies is not clear. There is nothing in the record, however, to suggest that UMO did not benefit from loans made to its sales agents owned by Propper in the same fashion that it benefitted from loans made to its other sales agents. Plaintiffs even acknowledge as much by not asserting, under their fraudulent conveyance theory in Count 2, any claim to the UMO assets applied to the debts of Propper.

16. Mr. Trent testified, "[T]he food stamps generated cash. The cashing of checks required cash. You didn't need to borrow money for the issuance of food stamps."

An important corollary of this point is that the need to increase the loan lines arose not because the check cashers were engaged in the sale of food stamps but because they lost money in the ordinary course of business: only by commingling food stamp revenues with the dwindling working capital of their check cashing businesses were the check cashers able to build up the "food stamp float". The risk that the check cashers would lose money was of course a risk that Trent and Skowron (and USN and UMO) had shouldered from the moment they agreed to guarantee the check casher loans. Thus, MHT was not foisting some completely extraneous obligation upon them. None of the guarantees placed any restriction on the nature of the business to be conducted by the sales agents with the loans obtained from MHT.

Plaintiffs have attempted to insinuate that MHT may have acted out of a fear that it would be held responsible if the food stamp debts were not paid off. The evidence completely fails to support this suggestion. The government memos and letters submitted all acknowledge that the vendor banks in New York had steadfastly refused to assume any such liability, and that the "last [and only] contract provides that all liability for shortages of sub-vendors is between the individual sub-vendor and New York City."

Since at all times there was fair consideration for UMO's guarantees, the guarantees and the application of collateral pledged thereunder cannot have constituted fraudulent conveyances.

*Plaintiffs did not carry the Burden on Insolvency or Insufficiency of Capital*

Plaintiffs have likewise failed to sustain their burden of proving that UMO either alone or taken together with the other parts of the enterprise was insolvent at the time the guarantees were made, or that it had an unreasonably small capital for engaging in the money order business. Again, UMO has been artificially segregated by the trustees from the overall enterprise, the solvency or insolvency of which was not established. Plaintiffs introduced a report compiled by the California State Banking Department purporting to find, as of March 31, 1976, a negative net worth of UMO on an alone basis of some $561,000. However, this assessment was disputed by plaintiffs' own witnesses, Mr. Sparago and Mr. Trent, who both testified that USN and UMO were viable, solvent going concerns until at least the last week in December 1976. The company's books likewise showed a positive net worth at all relevant times well into 1977.

The only other proof plaintiffs submitted in this regard was the testimony of Mr. Waters, who was hired to perform an audit of UMO as of January 31, 1977. Although Mr. Waters orally reported to the trustee of UMO that as of January 31, 1977 the company had a net deficit of about $6 million, the opinion he ultimately gave was a disclaimer of opinion. Even assuming, however, that as of January 31, 1977, there was a deficit of $6 million, this fact would be unhelpful in ascertaining the solvency of UMO at the time (months, even years earlier) when the guarantees were made, or even as of December 1976, when the loans in question were made.

The most that plaintiffs have accomplished is to have raised a question about the solvency of UMO late in 1976 and the evidence presented was conflicting. The insiders—the people most intimate with the company as witnesses for the trustees (with a self-interest antagonistic to MHT)—testified that it was solvent, and their testimony is not to be lightly discarded. Since at a minimum plaintiffs did not sustain the burden of proof on the issue of insolvency, and moreover since there was fair consideration for the guarantees and the ultimate application of the collateral pledged thereunder, it cannot be held that there were fraudulent transfers in the circumstances.

*UMO and USN were not discharged as Sureties*

■ Finally, plaintiffs attempt to revive the claims asserted in Counts 2 and 10 in a somewhat different guise by casting them in terms of suretyship law rather than bankruptcy law. Under Count 2, plaintiffs argue that MHT's alleged decision to stop extending loans to out-of-state check cashers [17] represented a unilateral modification of the agreement between UMO and MHT that discharged UMO from its role as guarantor. This theory, which plaintiffs totally failed to include in their pleadings, provides no basis for recovery, because under the agreement MHT was under no obligation to extend *any* loans. The agreement was merely that Trent and Skowron and their various incorporated pocketbooks would guarantee any loans MHT chose to extend. Hence, MHT's decision not to extend certain loans was merely an exercise of its rights under the guarantees, not a modification of the agreement.

Under Count 10, plaintiffs claim that the use of guarantees of USN and UMO to cover the indebtedness of check cashers to the City on food stamp obligations was an unconsented-to modification of the underlying agreement and discharged the guaran-

17. It should be noted that the only non-hearsay evidence that plaintiffs have presented that MHT in fact refused to continue making out-of-state loans is in the form of a document showing that the ratio of in-state loans to out-of-state loans was 18.56 to 1 in December 1976, as compared to a ratio of 2 to 1 in November. However, there is no evidence that Trent and Skowron requested that loans be made to any out-of-state check cashers in December except for those who received them.

tees. This theory likewise falls to the ground.

No modification of the underlying agreement occurred. USN and UMO had guaranteed all obligations "now or hereafter incurred" on the account of Messrs. Trent and Skowron. By its very terms, the amount of obligations covered by USN's and UMO's guarantees was variable and indeterminate. The decision reached by Trent, Skowron and MHT that National and TWO needed more money under the loan line was not an alteration of the guaranteed loan line schedule—it was consistent with the original intention of the parties that there be a month by month specification of the loan lines to be covered by the guarantees.

At any rate, however, there can be no dispute about whether UMO and USN consented to this increase in the loan lines to National and TWO. In the letter dated September 15, 1976, Mr. Skowron expressly requested that MHT increase the maximum amounts available to National and TWO under the loan lines. Messrs. Sparago, Trent and Skowron all testified that the understood purpose of this increase was to allow the check cashers to wipe out their "food stamp floats". Mr. Trent admitted that Skowron unquestionably had authority to make this request, and that when he did so, he was acting on behalf of the whole Trent/Skowron group. There is no doubt that UMO and USN must be deemed to have consented to any "modification" that may have occurred.

*Count 4*

 Count 4 asserts that in August 1971, John Trent caused record title of 5,000 shares of Gulf Oil Common Stock to be transferred from the name of USN to his name and that he pledged the stock as collateral under the guarantee executed by Trent and Skowron on November 13, 1970. MHT held the stock for more than six years until it liquidated it and applied the proceeds to debts owed by Freedom Check Cashing Corporation, a check casher covered by the Trenton/Skowron guarantee of November 13, 1970.

Mr. Trent testified as to the circumstances surrounding the transfer of this stock from the name of USN to his name. He stated that he had asked MHT whether certain stock registered in the name of USN was acceptable as collateral under the Trent/Skowron guarantee, and that he had been told it was not; rather, he was told, only stock that was in his name would be acceptable as collateral for the guarantee in question. Mr. Trent went on to state:

> So I had it [the 5000 shares of stock] put into my name and it stayed on the books of USN as an asset of theirs and I submitted it to Manufacturers Hanover Trust Company and they accepted it.

MHT claims that it is a bona fide purchaser under N.Y.U.C.C. Section 8–302, and consequently took the stock free of any adverse claim USN might have against Mr. Trent. A bona fide purchaser is defined as "a purchaser for value in good faith and without notice of any adverse claim . ." N.Y.U.C.C. Section 8–302.

The evidence supports MHT's assertion that it was a bona fide purchaser. In accepting the stock as collateral for loans under the Trent/Skowron guarantee, MHT became a purchaser for value. N.Y.U.C.C. §§ 1–201(32) and 1–201(44). MHT certainly acted "honestly in fact" by specifically informing Mr. Trent that it could not accept any stock that was not owned by him personally. N.Y.U.C.C. Section 1–201(19). Finally, there is no evidence to suggest that MHT had any notice of an adverse claim by USN; indeed, having recently told Mr. Trent that it could not accept stock held by USN, MHT had every reason to believe that the stock he sought to pledge was owned by him.

Moreover, in view of the findings herein that USN was the alter-ego of Messrs. Trent and Skowron, there is no sound reason or factual basis on which to treat the deposit of this stock as other than a deposit of Mr. Trent's own assets.

There is thus no basis for a recovery against MHT under Count 4.

## CONCLUSION

The Court concludes that the plaintiffs have failed to prove a valid claim against MHT and Counts 2, 4 and 10 of the amended complaint against MHT should be and hereby are dismissed, on the merits, with costs. This dismissal consequently terminates all claims herein of the plaintiffs against MHT. The Clerk is directed to enter judgment accordingly.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52(a), Fed.R.Civ.P.

SO ORDERED.